May it please the court, Joel P. Schiff appearing on behalf of the Plaintiff, Appellant, and Cross-Appellee Jeffrey Convitz. You've heard a number of criminal cases this morning in which the subject of defendants' liberties have been discussed. And I'm here to talk about the effect and denial to the Plaintiff, Mr. Convitz, of also a fundamental right. A fundamental right to pursue his livelihood for a period of three years, which was denied to him by an intentional fraud which commenced back in 1994 and proceeded, in essence, all the way through the trial in 2002. He won. I'm sorry. Didn't he win? I missed something. Didn't he win? You said you brought this case because he was denied certain things, and the answer is yes. You're right. He won. He won. The jury awarded a sum of approximately $215,000 in compensatory damages and approximately $4,785,000 in punitive damages. And you're complaining that the punitive damage award shouldn't have been reduced from what was it, 22 times? It was 22 times the compensatory damage award. It was not 22 times the amount of harm which was actually caused to the Plaintiff. But the harm, of course, the harm. There was an instruction on the harm, wasn't there? There was an instruction on the measure of damages. Indeed, Your Honor, there was an instruction. And you didn't ask for a benefit of the bargain instruction, did you? The answer to that question is trial counsel did not specifically request that instruction, but that instruction should have been given in any event. Oh, wait a minute. Well, I mean, I've been around long enough to know that lawyers aren't, they don't ask for these instructions. And the judge holds a charging conference and says, okay, I'm going to give this instruction. And then nobody says, oh, the judge, you have the wrong theory. Don't do that. They don't say anything. And isn't there a rule? Isn't there a rule which says you waive it? There is such a rule, Your Honor, but the facts of this case are that at the commencement of the damage phase of the trial, the trial judge indeed asked what the Plaintiff's theory was, and he said it was benefit of the bargain. And ---- Well, but tell us the case. I mean, this is why judges like to do instruction conferences more in civil than criminal, because in criminal, obviously, judges have certain sua sponte duties, and they have to make sure they cover everything. In civil, if the lawyers don't give it to you, then, and they don't object, you know, there's, I know of no theory that you can complain about it. The theory is that the instructions must cover the essential elements of the case on a sua sponte basis. But whose responsibility is that? It's everybody's responsibility, Your Honor. So you're saying the Court has a sua sponte duty in civil cases? Yes, it does. Cite me as case. There are cases cited in the brief that so state that the instructions must cover the law in its entirety in civil cases as well as criminal cases. The ---- But maybe we ought to get one issue out of the way. I understand your argument is that the real damages in this case were something other than what the jury awarded. That's your argument, okay? Yes. Okay. But we know the jury awarded, what, 200,000 or 180,000? 215,000, Your Honor. 215,000, and the punitive damage award was 22 times that. Correct. Okay. If that award was appropriate, that is the $220,000 award, is there any question that the judge was not correct in reducing the punitive damage award in light of the Supreme Court's decisions? Yes, there are for several reasons, Your Honor. Reason number one is should the judge have, we have two questions. One, should the judge have reduced the award at all, and if so, to what level? On the question of reducing the award at all, the Supreme Court statement is that few awards exceeding single digits multipliers to a significant degree will withstand constitutional muster. And the question is, what is significant degree? Single digits is 9.9. Does 22 exceed 9.9 to a significant degree, such as to make the overall award grossly excessive? Well, counsel, we're talking about money here, right? We're not talking about grievous physical injuries and disfigurements and the kinds of cases in which sometimes a higher proportion has been allowed. Why isn't the most comparable thing for the trial court to look at trouble damages statutes, which are expressions of social norm about what happens when there is basically a financial fraud? And so in light of that, why isn't 5-1 as good a guess as any? Several reasons to that, Your Honor. Number one, we are dealing with physical injury as well as the other reprehensibility factors. He didn't testify to any physical injury, did he? Yes, he did. He testified to being in the hospital for arrhythmia by reason of the loss of income and emotional distress that he suffered during the course of the fraud. And he was in the hospital several times, and I believe he testified to further cardiac arrhythmia. The jury awarded $50,000, right? The jury awarded $50,000 for emotional distress damages. That is correct, Your Honor. So there is a physical injury. There is a fraud by a fiduciary, which is even worse than a normal fraud, and because of the obligations that a fiduciary takes on to his beneficiary, and that is discussed at some length in the California case, the Bartas v. Oates case, which is relatively similar to this case, to a financial fraud by a fiduciary in which … What was the proportion in the Bartas case? The Bartas case came out at 9 to 1, saying that that was the highest single-digit ratio, and therefore the Bartas court believed that it could not exceed a single-digit ratio. So this is twice as bad as the Bartas case, at least. I mean, I'm just having difficulty grasping this. No, am I saying this case is twice as bad as the Bartas case? You have to be saying that 22 to 1 is appropriate when 9 to 1 was appropriate in Bartas. I'm saying that in Bartas, the Bartas court said that not all of the reprehensibility factors favored the plaintiff, and I'm saying that all of the reprehensibility factors favored the plaintiff in this case. There was a physical injury. There was a conscious disregard of the plaintiff's interests, because the plaintiff warned the defendant, Matt, of his vulnerability and his need that the defendant take on a fiduciary obligation to him, that the defendant voluntarily agreed to take on that obligation, as well as becoming a corporate director of the multipix entity, so that there was a conscious disregard. Well, the defendant – your client is a lawyer, correct? My client is a lawyer, yes, Your Honor. And a lot of what caused the problems here was never put in writing, right? One doesn't usually – first of all, certain things were not put in writing, correct, Your Honor, but this is not the kind of a – you don't normally put fraudulent representations in writing. The fact that the representations were not put in writing is typical of a fraud case, and it's typical of a case involving financing of a startup entity. You don't – those are not the kinds of things that get put in writing. Well, it seems to me when you're talking about promises to provide $22 million and things like this, that if law school would do anything for you, you would get nervous about that not being in writing. You don't need to get nervous about that, Your Honor, when you have the personage of Matt and his company, his track record, as he boasted about, his partner, Mr. Smiley, who was telling us that all of Mr. Matt's transactions always closed, his huge office in the Midland-Walwin building. This is a money manager who said he controlled $300 million and was going to deliver it. So both sides are sophisticated. You're saying both sides are sophisticated. You're saying the defendants were sophisticated, big reputations, and, of course, the plaintiff's a lawyer. So, I mean, he must have some idea of what the law is, and he's sophisticated. But, you know, going back to your arrhythmia, just thinking about it, the evidence that he got the arrhythmia as a result of the fraud, that's based upon a statement that he made, and he testified to that, right? The arrhythmia developed six months after the discovery of the fraud. So it's entirely possible the jury disbelieved that or didn't see any causal connection. There was no medical evidence, was there, that the fraud caused the arrhythmia? There was no requirement that medical evidence be presented. No, but he used the burden. It's called the burden of proof. He testified. I'm sorry, Your Honor. It's called the burden of proof. Yes, it is, Your Honor. He testified that he developed the arrhythmia during 1996 at a point in time when he was still attempting to assist in trying to revive the transaction, and at a time when he had no income by reason of the fraud. But he discovered the fraud. My point is he discovered the fraud in 1966. By the way, the fraud was, I have $22 million. I'll get $22 million. If, in fact, the defendant had said, you know, I'm very wealthy. I'm going to use all of my best efforts to get the $22 million. I'll do everything I can. I think I can do it. I can't guarantee, but I think I can do it. There would be no case here whatsoever. There would be no case here whatsoever, Your Honor, because Mr. Convis would never have entered into the transaction. He so testified. And if he didn't enter into the transaction, he would go back, how grim this must sound to everybody in this room, he would have to go back to the practice of law. And he'd have to earn his income like every other unfortunate lawyer out there who has to earn their living. That's what would have happened. And so what the jury did, which I thought actually, in my view, was very, very smart, they said, look, he spent so much time on this project, he was going to be compensated a particular way, that's what we're going to give him, because he lost that money. But he lost considerably more than that because he would not have started into this venture without the agreement for a five-year employment contract that he proved that he lost. He proved that he lost the value of his entire employment contract. He lost the opportunity, the benefit of the bargain. I understand, but your argument is he lost the benefit of the bargain, not that he was out of pocket. He lost, though he was out of pocket, as the jury found, for that period of time. But your argument is he lost the benefit of the bargain, and that's where we started this discussion today. In addition, Your Honor, he proved out of the mouth of the defendants' expert, even though I don't believe, we don't believe that the defendants' expert should have been allowed to testify, but he proved out of the mouth of the defendants' expert that if the defendants had performed as represented, this company would have been in business for a minimum of three years from the closing date, at which point he would have earned $750,000 under the contract that nobody denies. Counsel, this is a question that I'm going to pose to you, but I'd like all other counsel to answer it for me as well. This case involves money. All of you now know what a jury is likely to do with it. Has there been any effort to use the services of our mediation section on this matter? There has, and it was not successful, Your Honor. Okay. I guess that's the answer from all of you. We held a session with the mediator approximately 15 months ago. It was not successful. I wish to get back to the reprehensibility factors for a moment. There's certainly no doubt that there was trickery. There was no doubt that there was long-term trickery, which carried over both through the discovery phase and through the trial of the action, as more fully set forth in the brief, in terms of the not only spoliation of evidence, which is described in the brief, but the falsification of evidence that occurred during the course of the trial. I also want to point out that there was a – that the element of the – What happened to those claims? I'm sorry. What happened to the claims that evidence was falsified and destroyed and so forth? What was the outcome? The – well, the plaintiff won this case on the issue of liability, but it goes to the issue of reprehensibility in terms of the calculus of punitive damages, Your Honor. The case law says that if a defendant is concealing or falsifying evidence through the trial, that that shows a greater degree of reprehensibility for punitive damages calculus than otherwise. I also want to point out the issue that the defendants could have, but did not, give the plaintiff an opportunity to fix the problem and mitigate his damages by having told the plaintiff the truth in August of 1995, when he had the opportunity or was presented with the opportunity to return to the company he built, which had suffered – gone through a proxy fight, and the new board – representative of the new board came to him and said, we want you to come back and contemplate running the company. And when the defense learned of that fact, they blew up at him and said, you can't do that. You have to bring the company to us. Who's in a better position to judge whether conduct is reprehensible? A district court judge who hears all the evidence or the appellate court reviewing the district court's findings? And by the way, do we have a de novo standard? Yes, you do, Your Honor. Okay. Now, what do you think? The district court actually found the conduct to be reprehensible and said that that's why I'm putting it on the high end of the scale in terms of reprehensibility. I apologize, Your Honor. No, go ahead. I think this Court is equally capable, as it said in the Leatherman case of – the Supreme Court decided it, that it is equally capable of making those calls as the district judge, which is why the law says it doesn't get remanded to a district judge. This Court – But these are the – I'm only referring – I understand that as a general rule, but I'm referring to the acts of – the so-called reprehensible acts which occurred in the presence of the district court. During the course of that litigation, the defendant did X, did Y, did Z. And so, I mean, there the judge is like the eyewitness to the incident, can make some determinations as to what its impact was on the litigation. The – that may be the only area, Your Honor, where the district judge might have a better view of the proceedings than this Court does as to whether – as to the degree of reprehensibility as affected only by falsification of evidence in the trial itself. As to everything else, this Court is in every bit as good a position to evaluate the reprehensibility of the defendant's conduct. I want to turn for a moment, however, to the question of even assuming that the ratio of punitive damages to actual damages awarded by the jury exceeded single digits or if it exceeded what this Court would view as a constitutional limit. If single digits is a constitutional limit, then the question is what is the degree to which a reduction is proper in the course of appellate review? And I think the law really is that when the jury makes a determination, this Court is really reviewing not the determination of the trial judge so much as the determination of the jury. And can examine that determination based on all of the reprehensibility factors and conclude that a maximum single-digit ratio is the gross limit of proper reduction. Because as was said in the – Sorry. Is there some case that says that we're supposed to give some deference to the jury verdict when the jury verdict is greater than what would be the constitutional permissible amount? Yes, you are to give some deference to the jury verdict. And that was conduct – excuse me, Your Honor. That was stated in the very recent case in the Third Circuit, the Willow Inn case, which was provided to the Court in the supplemental authorities given. And there are other such cases. And indeed, the general rule is that this Court must accept the findings of the jury and view the award of punitive damages or the facts which underlie that award most favorably to the jury's verdict. Counsel, you have used almost all your time. If you'd like to save any for later. I'll reserve the balance. Good morning, Your Honor. May it please the Court. My name is Mark Epstein. I'm with Mungert, Olson & Olson, and I represent Midland. Mr. Rosen and I have agreed to divide our time in the same manner that – if it's acceptable to the Court, in the same manner as our briefs were divided. So you're not complaining about the punitive damages, right? Well, I am the person arguing the punitive damages, but I'm not complaining about it. You're right. Okay. So in other words, an argument can be made that five to one was too high. An argument can be made. But you did not make that appeal. We did not make that appeal, and we are not making it at this time. We are willing to accept the five to one ratio that the trial court found in this case. And I think that ratio is very comfortably in line with all of the case law that has come out both before and since State Farm. Do you agree that we have de novo review of the constitutional question of the maximum permissible punitive damages award? Your Honor, I don't think the question has been squarely addressed in this circuit as to the standard of review in the event that the district court finds that the jury's award is constitutionally excessive. I think, however, that in all the cases that have discussed the issue of this Court's review, although in other procedural contexts it has been de novo review, I would point out – I'm sorry, Your Honor. No, go ahead. I would point out, however, that the trial court made an alternative finding, which was that the punitive damages award was excessive under California law. That was in response to an argument that we had made in our motion for a new trial that the jury was moved by passion and prejudice as a result of the plaintiff's counsel's closing argument and other facts. And the trial court found that to be persuasive as well. That determination, Your Honor, I do not believe is reviewed de novo. I believe there the trial court's grant of a motion for a new trial under that procedure is reviewed for abuse of discretion. And although plaintiff has not spent very much time on that argument and indeed didn't really address it in his opening brief, I think that provides an independent ground upon which to affirm the punitive damages reduction below. Well, I'm not very conversant with California law. Even after a few years doing this. But at least on the federal side, it always strikes me that the fixing of a number is a relatively arbitrary exercise. How do we know? What are the rational factors that we apply to know whether 5 or 6 or 8 is the right ratio? Your Honor, obviously this is, I interpret the question as sort of how does a court go about doing that? And I don't think, and I think as the Supreme Court said, there's no particular bright line test. You can't, it's not like the sentencing guidelines where you can. That's a story. I'll mention that. My apologies, Your Honor. I imagine a worse example. Strike that. There's no, there is no mathematical calculus that either this court or the district court can look at and sort of chalk up this one and that adds it a little bit. But the factors, the sort of guideposts have been set out. They've been set out most recently in State Farm by the Supreme Court, but in cases before that, Gore v. BMW. And I think we've argued in our brief that this case falls on the light side of punitive damages. Now, we're not arguing. Now, wouldn't the district court, though, having heard the trial and actually have seen the witnesses be in a better position to make those sort of subjective calls? I certainly believe so in this case where we know that the trial court did in fact reduce the number. I think that where the trial court denies a new trial motion, the de novo review is very important. The issues that go to the trial court under State Farm and under Gore are sometimes issues that don't go to the jury. You wouldn't necessarily put in a jury instruction necessarily about the other comparable injuries. It would be hard for a jury to compare other cases that have come up and look at the ratios in those cases. So there's a very important constitutional challenge. But if you decide to go from 22 to 1 to 5 to 1, it would seem that when you've actually heard the trial, when you've seen the people, when you have a sense of how damaged someone was, that you would just have a better sense of those intangibles. Absolutely, Your Honor. And I think that in a case like this where Judge Matz did sit through the entire trial, and we know that Judge Matz did apply the various tests set forth in State Farm and in Gore, and actually looked at the reprehensibility factor as had been demonstrated by the evidence, looked at whether there was any physical injury, which I'd like to get to before I close, looked at the relative vulnerability or non-vulnerability of the parties. I think the trial court is in a very, very good position to make that determination. I think it would be extremely hard for an appellate court necessarily, not having actually sat through the trial, but even with the benefit of the record, to look at the trial court's determination, look at the trial court's deduction, and say, well, five for one isn't right, maybe it's 5.3 to one. Well, I mean, in terms of when you're assessing vulnerability, whether someone's, you know, the sharpest knife in the drawer, or whether, you know, they're sophisticated, or you get a sense of those things when you're around people, or when you have an opportunity to see them testify, or see how they react. I agree, Your Honor. So long as it's clear, as it is in this case, that the trial court did engage in that analysis, and did in fact weigh those factors, and then did determine that five to one was the appropriate ratio. Five to one, I might note, is also the ratio that plaintiff's counsel suggested to the jury in his closing argument. It's also very, as I said, very comfortably within the other cases that have come down. But of course, in that one, he thought the damages would be a lot more than $200,000. Well, he could have clarified that to the jury, Your Honor. I only mention it because it is one sort of guidepost that's out there, sort of what ratios are. I certainly agree that the size of the compensatory damages award may have an effect on the ratio. It certainly does. The Supreme Court has said as much, and I don't dispute it here. But even with all of that, I think the five to one ratio that the trial court set is very, as I said, it's very, very comfortably within cases like Roma, the forward rollover case, where people are dying. And the court said five to one, or approximately five to one. So I don't think here there's any cause to question the trial court's determination. It's also worth noting, to the extent that we're going to give credence to the jury's factual findings, as we do, that the jury found there was no oppression and no malice in this case, which in my experience is an unusual finding, where the jury determines that there is going to be punitive damages. The sort of end run that the plaintiff tries to do around that is to say, well, okay, the jury may have come up with 215,000, but the real number should have been 10 million. And there I think the real problem that the plaintiff has is that he's arguing his case as if he were arguing it back to the jury. Here the jury was instructed in a general instruction to compensate the plaintiff for any harm caused. The plaintiff was allowed to argue or articulate during the closing argument his views as to what the appropriate measure of damages were and how much the damages should be. And the real problem is that the jury didn't buy it. The jury ultimately found that it would award him for his time and that it was appropriate to do so, and it awarded him $50,000 in emotional distress damages. But it didn't buy his other arguments. I mean, at the end of the day, what he's really arguing is that no reasonable argument could possibly have not been convinced by the evidence Mr. Convitz put on. And I don't believe that that's an appropriate determination from this record. From this record, where you have expert testimony that the enterprise was doomed to failure. In this case, where you don't have a good articulation of any sort of balance sheet or any equity or even liquidation value that the company had. In this case, where the theory that was articulated below on the new trial motion was, what if Mr. Convitz liquidated the company immediately upon getting the money and defrauded all the investors who had just put in $22 million? But even there, there was no evidence as to what the liability side of the House looked like. So I think where we really are here is that the trial court was exactly right with regard to the amount, with regard to the damages calculation, with one exception. And that exception is emotional distress. The arrhythmia to which counsel refers was a statement made by Mr. Convitz, and we've cited it and quoted it in our brief, where he is explaining why it is he didn't do more work to mitigate. Counsel, again, my disclaimer about California law, but it was my understanding that in the face of an intentional fraud, as distinct from mere negligence, that a physical injury was not required to recover emotional distress damages. Am I right or wrong about that? A physical injury is not required, but in the context of a situation where there is no physical injury, even in the context of a fraud, there has to be It isn't that a pretty good thing for a jury to hear. I mean, this man was called a liar, right? Isn't there evidence in the record that people called him a liar? There's some evidence. Okay. So if I'm a lawyer and I'm called a liar, don't you think I might, isn't it reasonable that I might suffer some emotional distress as a result of that? It might be, Your Honor, but the argument that was presented to the jury on this question wasn't the argument that, gee, he felt really, really bad about being called a liar for a long time. The argument that was presented was that this arrhythmia was a life-threatening and that this arrhythmia was something that put him in the hospital. Well, the jury got a correct statement of the law. He testified about his arrhythmia, when it happened, and all of that. So if they think it satisfied those prongs... So long as there is some evidentiary basis, I would agree with you. But here... Well, it was after it happened, and, you know, he claims he didn't have that before, and then he gets arrhythmia, and, you know... But there's no testimony to the jury as to what causes arrhythmia. There's no testimony before the jury that links or even attempts to link the arrhythmia. But that argument, that would be better. I think it's necessary, Your Honor. Before a jury can find that a medical condition that I have was caused by the defendant's conduct, there should be some evidence as to what causes this medical condition. Well, that's the reason I started by asking if the physical injury was a necessary part of it, because I'm not having a very easy time articulating this. But if there isn't a requirement to prove to a medical certainty that a medical condition, physical condition, was caused by the stress of these events, why isn't this enough for a jury to infer that the stress of being called a liar and the other things that had happened to him of having this thing unravel was a sufficient stressor to cause his problem? Well, there's no evidence that stress causes arrhythmia. But there is evidence that Mr. Condon, the plaintiff, was outraged when the deal fell through. Yes. That's one thing. Okay. So outrage, as long as it's not just a temporary, you know, situation, outrage alone could support, couldn't it? Under Berg, only if it's a degree of lasting. I don't believe there was evidence sufficient to that effect, even in this record. He said that the situation caused domestic disruption, frustration, anger, and anxiety. Now, none of that's far-fetched, is it, in light of how he was treated? Your Honor, none of that might be far-fetched in the sense that a jury could believe, and I agree with that. But is that enough to satisfy Berg? I think not. Well, they found it was $50,000 worth. They found $50,000. Your Honor, yes, that's correct. Maybe less than legal fees incurred in some litigation. No evidence of that, Your Honor. I certainly don't intend to stipulate to that point. I take it, though, that you would agree with opposing counsel's assessment of the efficacy of mediation in this case? Your Honor, we made an attempt, and without going into the details, I don't want to know the details. I agree that we did try a mediation using the Court's good offices, and it was unsuccessful. Okay. Your Honor, I see my time is running, and I would like to give Mr. Rosen an opportunity to discuss his issues. So if the Court has further questions of me, I'd be happy to answer them. Otherwise, I will cede the podium. Elector, pardon me. Thank you. Thank you. Mr. Rosen. Thank you, Your Honor. My name is Morton Rosen. I represent Defendant Denny Matt. My issues are not the same, although, of course, I concur with Mr. Epstein's comments. We have been liberally divided up. There was discussion in the questioning of Mr. Schiff about the vulnerability of Mr. Conditz. I think it's important to be very specific about that. He's not just an attorney. He's a businessman. He's an executive. He ran a company. He testified that he was very experienced in securities transactions, that he spent the better part of a week in Canada in October of 1994, at the beginning of this deal, personally researching Canadian law. And throughout, he had his partner, Mr. Smiley, the Canadian lawyer, executive, the person who ran the multipix. So Mr. Conditz is perhaps the least vulnerable plaintiff who can get it. Does that mean, though, that you can't have a fraud perpetrated on you? No, it does not. But it simply is important to understand, because that segues into my next point, which was, what do we claim to have done? What does my client, Mr. Matt, claim to have done? Now, let's be very clear. Mr. Matt's employer, Midland, was not going to provide any services or any money in connection with this proposed financing transaction. Mr. Matt's employer, Midland, dropped out as a sales agent seven months before September 1995. The only claim against Mr. Matt is the self-defeating one, that he promised, one, I have all these clients with all these money. They love me. They trust me. They respect me. If I recommend to them that they put up $22 million for multipix's financing transaction at $150,000 a unit, they will do what I say. That's what he's supposed to have said. And that's what the jury found. They find out. That's exactly right. Okay. So the question was there evidence, and they found it, and that's that. Well, I disagree. You said there's no evidence. I said it's a self-defeating argument for the following reasons, and there are cases in this circuit and in California that say when a jury found something that's preposterous and irrational, this Court, any Court, does not have to accept it. Why do I say that? If Mr. Matt said just those things and put no conditions on it, if in October 1994, which is when he's supposed to have made this promise orally to Mr. Smiley and his partner, Mr. Conovance, no matter what, if the deal turns out to be terrible, if the deal turns out to be absolutely imprudent, risky, reckless, would destroy my reputation with my clients, I still will get you $22 million. Remember, it's clearly understood that Mr. Matt does not have the money. It has to come from his clients, the people who formed the basis of his entire career, the people who formed the basis of his income now and in the future. But he also said that it was committed. Yes, exactly. The money was going to be their absolute thing. Exactly. And that's what they testified to. Okay. Let's assume the jury found it, because I'm not going to waste the time arguing about the jury's resolution of conflicting testimony. You could use a lot of words, committed. What they're saying is irrevocably, forever, when the money has to be there, it's going to be there, even if I think this is going to be the worst deal my client's ever made. I put it to you, that is not reasonable, justifiable reliance. Except that what was justifiable, there was evidence that he had come through in the past, and that was what was reasonable about the reliance, isn't it? That he had made similar promises in the past, and in the past they had come through. No. Excuse me, Your Honor. I don't believe the evidence goes that far. The evidence goes to this effect. There were four prior transactions in which Smiley did limited partnership interests in some investments in film-related ventures. And Mr. Matt did recommend to his clients that they invest, and he did invest. There is no evidence regarding when he made a commitment with regard to those transactions, how much money was involved. No, but the point is, Convis doesn't know Matt, right? Correct. He doesn't know him. But he knows Smiley. Correct. And he has a right to rely on Smiley. That's not unreasonable. But if Smiley says something, he can rely on him, can't he? I mean, certain things, I'm not saying everything. But, I mean, in business matters, Smiley says, I know Matt. Right. And he says, Matt's met Matt in four deals. He delivers. Right. So it's not just Matt coming out of the, you know, wall, saying, I've got $22 million, by the way. That's, to some of us, that's a lot of money. And he says, he goes to Smiley, and Smiley says, yeah, this guy's good for it. Right. Well, then why is he saying Smiley? Why is that just preposterous? It's preposterous. It's preposterous because they know, through Smiley, Convitz knows that Matt is a financial advisor. Convitz knows that financial advisors have to make prudent recommendations to their clients. They're required by law to do that. They are liable if they don't do it.  Now, if I had proposed, if I had told my clients they should invest, I would have been sued by my clients, he said. It would have been imprudent. Convitz is known, Convitz knows, that that is the standard under which Matt must operate. And as the court noted in the prior questioning, there is not one piece of paper from anyone, to anyone, in which there's even a hint that Matt made this totally unconditional, reckless, foolish, imprudent promise. He definitely boasted. I've got the money. I'm committed. My people will do what I tell them to do. And he's paying the price for his boastfulness and his arrogance. But the question is really, did Convitz reasonably and justifiably rely upon a statement? Months, well, let's see. It's 11 months before the proposed financing transaction went to the public. Eleven months later, I'm going to give you the money, even if during those 11 months it turns out to be an absolutely dreadful deal. Nobody can reasonably do that. Kagan. Counsel, I think we understand your position, and you have exceeded your time by a lot of minutes. Well, then I won't waste any time on jurisdiction, because I think our positions are fairly clear on that. We know that no issues are waived. And if they haven't been covered in oral argument, we will consider the briefing on them. Thank you, Your Honor. Thank you. You have a brief amount of rebuttal time remaining. And I will be really quick. As to Mr. Rosen's last point, I referred to page 26 of our appellant's reply brief, where the testimony was summarized as to Matt's unequivocal commitments of commitment that he had discretionary accounts, that he had the power and control to deliver the funds, which is more than sufficient for not only reliance, but it doesn't make anything preposterous. Second, as to the five-to-one ratio that the trial judge used, he used it, as he said, primarily because that was what trial counsel argued, and he argued it based on a wholly different concept of compensatory damages. It would not have been so done had one been talking about a compensatory damage award as small as this, and I refer to the Bardis case on that as well. Third, the fact is there was error prejudicial to the plaintiff in the conduct of the damage phase of the trial. A motion for new trial was made. It was improperly denied. This Court can consider all of the harm to the plaintiff in dealing with the ratios in this case, including the three years that their expert testified he would have been able to work at $250,000 per annum had the defendant performed as represented and fraudulently represented.  Thank you, counsel. Thank you.
judges: Graber, Callahan, Breyer